1    THE COURT:  You're not saying there may be a

2    subsequent witness to link it up to Mr. Garces having said

3    the travel.

4    MS. OHLEY:  Having said the travel was his.

5    THE COURT:  Connected to drug runner.  All right

6    I'm not going to admit it then on the basis of relevance.  I

7    will admit it as a business record but you can't use it until

8    it becomes relevant.

9    MS. OHLEY:  Understood your Honor at this point we

10   would then call our subsequent witness and renew those

11   records at a different time.

12   THE COURT:  Okay.

13   MS. OHLEY:  These are your copies.  I'm sorry your

14   Honor.

15   (Back before the jury. )

16   THE COURT:  Are you going to change the order of

17   your witnesses.

18   MS. OHLEY:  Yes, your Honor.

19   THE COURT:  Sir, would you please step down.  We're

20   going to call a different witness.  Call your next witness.

21   MR. DEL MASTRO:  Your Honor, the Government calls

22   see guess special agent Steven Ray.

23   Your Honor, may I prepare the exhibits?

24   THE COURT:  You may.

25   MADAM CLERK:  Please raise your right hand.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    THE WITNESS:  I do.

2    (Witness sworn.).

3    MADAM CLERK:  Thank you please take a seat in the

4  witness box.

5    MADAM CLERK:  Sir, could you please state and spell

6  your name for the record.

7    THE WITNESS:  Steven Ray, R-A-Y.

8    THE COURT:  Proceed.

9  BY MR. DEL MASTRO:

10  Q.   Good afternoon Special Agent Ray?

11  A.   Good afternoon.

12  Q.   What do you do for a living?

13  A.   I'm special agent with the Coast Guard investigative

14  service currently assigned to the Operation Panama Express.

15    MR. MAYBERRY:  Your Honor, may we approach.

16    THE COURT:  Approach the bench.

17    MR. MAYBERRY:  Your Honor, I'm sorry for coming up

18  I didn't want to interrupt I didn't want to do it in front of

19  the jury I want to state my objection again to this witness

20  in total to preserve it for the record I didn't want to do it

21  front of the jury.

22    THE COURT:  Okay its overruled.  But I have not

23  ruled on the portion of his motion having to do·with the

24  recruiting which you have to lay a foundation about

25  recruiting without eliciting an answer.

1      MR. DEL MASTRO:  Your Honor, I'll go through

2  foundation I'm just going to touch on his limited lack

3  thereof in this present case and stop and request a sidebar.

4      THE COURT:  Well, when you talk about recruiting,

5  you can say do you have knowledge about recruiting methods,

6  yes.  How do you have that knowledge?  And lay a foundation

7  about how he says he knows about recruiting.

8      MR. DEL MASTRO:  Okay.

9      THE COURT:  And then.

10      MR. DEL MASTRO:  So when we get to that I can go

11  through foundation ask about the other areas.

12      THE COURT:  You can lay the foundation about all of

13  them, but as to recruiting you have to lay a foundation about

14  how he thinks he knows about recruiting before you can start

15  asking questions to elicit answers about recruiting.

16      MR. DEL MASTRO:  Okay ment understood, your Honor.

17      (Back before the jury).

18  BY MR. DEL MASTRO:

19  Q.   Good afternoon again, Special Agent Ray.  So I believe

20  were you testifying you worked foresee guess agent at

21  Operation Panama Express?

22  A.   That is correct.

23  Q.   And how long have you been at Operation Panama Express?

24  A.   Since 2011.

25  Q.   What is Operation Panama Express?

A.    Operation Panama Express as organized crime did you go

enforcement Strike Force composed of members of the Federal

Bureau of Investigation, Drug Enforcement Administration,

Homeland Security Investigations and Coast Guard

investigative service.  Its mission is to dismantle and

disrupt transnational criminal organizations who currently

utilize maritime conveyance toss move elicit drugs from South

America into Central America and Caribbean for further

distribution into the United States or in the lay men terms

we target people moving boats full of cocaine leaving from

Colombia, Ecuador.  Vens lay 15 going to places Ecuador

Guatemala, Dominican Republic and that cocaine goes four they

are up to the United States through that.

Q.    What is your role?

A.    I'm one the special agent assigned there and I work

hand-in-hand with my co-workers from FBI, DEA and HSI to

investigate these maritime interdictions and to facilitate

the case, to work to identify who the recruiters are,

organizers and ultimately the owner so that way we can take

down an entire network of criminal organizations and drug

traffickers.

Q.    Do you speak to any prior law enforcement experience you

have before?

A.    Absolutely.  Absolutely.  I graduated United States

military academy located in west point in 1959 and MISH

1  beyond as military police officer.  I served in effort George

2  in hunter Army air field in Georgia, tours in Bosnia, HEERTS,

3  Geneva and Middle East.  In addition.  Pro vote hunter Army

4  air properly authenticated.  Pro vote Marshall fantasy term

5  for military police station.  In 20,000 left active Army

6  became investigation in the Drug Enforcement Administration

7  assigned to the Seattle, Washington, worked on mobile

8  enforcement team and high intensity drug trafficking unit.

9  In 2005 I was transferred to Yuma, Arizona where I worked on

10  Yuma Narcotics Task Force and task or with the FBI

11  investigating drug trafficking leaving from Mexico into

12  Arizona.  In 2008 I left the Drug Enforcement Administration

13  and became a special agent with the Coast Guard investigative

14  service where I was assigned to the maritime Task Force in

15  San Diego which investigated maritime drug trafficking

16  leaving out of Mexico into the United States.  In 2009 I

17  transferred to Key West where I investigated drug trafficking

18  in the Caribbean and earn Pacific and 2011 was assigned to

19  Operation Panama Express.

20        In addition, in 2003 I joined -- I left the Army

21  Reserves and joined the Coast Guard reserves where I

22  stationed up in Seattle as a diver and then actually in LA

23  Long Beach when transferred with the DEA to Yuma.  In about

24  2005 I left being a diver for the Coast Guard as reserve and

25  became research special agent with the Coast Guard

1  investigative service.  When I became a full time 15 villain

2  the Coast Guard wouldn't allow me to be reserve special agent

3  and civilion special agent so I left being reserve special

4  agent and became a maritime law enforcement specialist where

5  I was assigned to the San Diego.  When I left to the Key West

6  with my civilian job a worked at TACLET south as a reservist

7  and then when I came up here working for operation can

8  machine express I served at sector St. Pete and then finally

9  retired out of the reserves with 25 years out of station St.

10 Petersburg.

11 Q.   You just referenced that you served in the TACLET, what

12 is that?

13 A.   It's Coast Guard tactical law enforcement teams.  They

14 specialize in deploying on US Navy assets and foreign vessels

15 like the Dutch, the British, Canadian ships so when those

16 European countries have vessels in the Caribbean primary

17 designed for hurricane response in territories when come

18 across drug trafficking law enforcement detachment

19 specializing on doing maritime boarding's on those vessels

20 and bringing them into the United States for prosecution.

21 When assigned to the TACLET South Maritime Trainer helping

22 them best practices for counter narcotics training.

23 Q.   In your career how many drug cases have you personally

24 investigated?

25 A.   Well over a thousand.

1  Q.  And how many maritime smuggling, maritime drug smug is

2  cases have you investigated?

3  A.  Well over 500.

4  Q.  Of those 500 about how many involved cocaine?

5  A.  Probably around 90 percent.

6  Q.  You said 90?

7  A.  Yes.

8  Q.  As part of the maritime smuggling operation

9  investigations that you conducted have you personally

10  processed drugs and nondrug evidence?

11  A.  Yes, I have.

12  Q.  Have you personally examined vessels that were used in

13  drug smuggling?

14  A.  Yes, I have.

15  Q.  Have you reviewed photographs and video recordings of

16  drug smuggling operations?

17  A.  Yes, I have.

18  Q.  Have you traveled to south Central America?

19  A.  Yes, I have.

20  Q.  What countries have you traveled to?

21  A.  I traveled to Colombia, Panama, Honduras, Mexico, Costa

22  Rica, Guatemala, Dominican Republic and Belize.  I believe

23  that's it.

24  Q.  I didn't want to interrupt you.  How about in particular

25  Colombia how many times have you traveled to Colombia?

1   A.   Dozen times to Colombia.

2   Q.   Overall those countries that you mentioned?

3   A.   I can't remember the exact number in the 20 some years.

4   Half dozen times to Panama.   Half dozen times to Guatemala.

5   Half dozen times to the Dominican Republic.   Two times I know

6   to Mexico.   Full number I don't fully remember.

7   Q.   When was the most recent time that you traveled down?

8   A.   2019.

9   Q.   2019.   Any reason why you haven't in the last couple of

10   years?

11   A.   Well, COVID happened and pretty much foreign travel was

12   locked down.   We actually had a FBI agent stationed in

13   Colombia couldn't return for six months because of lockdown's

14   instituted in those countries.

15   Q.   That was an agent stationed down there?

16   A.   Yes.

17   Q.   When you traveled to those countries have you IBLT acted

18   with law enforcement agencies down there?

19   A.   Absolutely.

20   Q.   Through those interactions have you become familiar with

21   the practices and customs in those countries?

22   A.   Yes, I have.

23   Q.   Have you visited sites where drug smuggling vessels are

24   launched from?

25   A.   I have.

1   Q.   Have you visited locations where drug smuggling vessels

2   are built?

3   A.   I have.

4   Q.   Have you examined drug smuggling vessels?

5   A.   Many times.

6   Q.   Have you participated in judicially authorized wiretaps?

7   A.   Yes, I have.

8   Q.   Have you conducted debriefings with participants in drug

9   trafficking operations?

10   A.   Yes, I have.

11   Q.   Who in those organizations have you participated in

12   debriefings with?

13   A.   I debriefed captains, mariners, mechanics, recruiters,

14   organizers, even the owners of these operations.

15   Q.   Have you worked with confidential informants?

16   A.   Yes, I have.

17   Q.   Have you worked with US law enforcement agents who are

18   stationed overseas like the one your referenced in CLUM why?

19   A.   Yes, I have.

20   Q.   Have you attended conference was foreign law enforcement

21   agencies?

22   A.   Absolutely.

23   Q.   Regarding international drug trafficking?

24   A.   Yes.

25   Q.   What did those conferences cover, what topics?

1  A.   A lot of it goes into investigation when you're looking

2  at these transnational criminal organizations about what's

3  happening in each of these countries that coordinate

4  basically a take down of these original nations in a unified

5  fashion so that way you can take down the entire network.  So

6  it goes through understanding original nations whose involved

7  in the organization, the evidence that we have, where we need

8  to further our investigations on these things so it kind of

9  gives you a great topic so then when it's time to make

10  decision for prosecution it will be a coordinated effort to

11  truly take down these organized crime.

12  Q.   Have you worked with law enforcement partners to execute

13  arrest war rents in foreign country?

14  A.   Yes provisional arrest warrants sent down to the country

15  and the whose country does arrest individual and those are

16  pending extradition to the United States.

17  Q.   And you learn where those arrest occur?

18  A.   They occur where week locate the individuals in those

19  countries.

20  Q.   Is this -- did you say you reviewed professional

21  literature on drug smuggling operations and trends?

22  A.   Yes, I have.

23  Q.   What specifically is that literature informed you about?

24  A.   It's the current trends of what's going on.  I

25  particularly pay more attention obviously to south and

1    Central America than I do for example, traffic of opium out
2    of Afghanistan.  I'm more focused on what's happening in
3    south and Central America for the Caribbean and earn Pacific
4    about what are the trends, what's going on, have there been
5    any unusual cases that have happened, and why those happened
6    and what the results were.
7    Q.    Have you taught any courses relevant to international
8    maritime drug smuggling?
9    A.    Yes, I have.
10   Q.    Would you please explain what they are?
11   A.    I'm guess speaker at the Coast Guard maritime law
12   enforcement academy and I teach about a four-hour block of
13   instruction at the maritime counter threat course, and ideal
14   specifically on drug trafficking in the earn Pacific and
15   Caribbean.
16   Q.    And what specifically do you cover in that course?
17   A.    So I go over the types of vessels that the Coast Guard
18   will have.  Kind of how cocaine is produced.  The
19   organizations on the maritime network.  About how mariners
20   are recruited.  How the recruiters are gathered up.  How the
21   organizers do it and ultimately the owners and then I have a
22   special emphasis on current case that is have happened in the
23   interdictions and that way Coast Guard members can better
24   prepare themselves to find the drugs as well as safely
25   operate or what they can expect if there is any increase up

1   particular in violence against the Coast Guard, or any new

2   they call them T TTP is a tactics and procedures that these

3   drug, the maritime drug people are utilizing they will fool

4   the Coast Guard and try to limit the Coast Guard's ability to

5   detect drugs.

6   Q.   Have you testified in court before?

7   A.   Yes, I have.

8   Q.   How many times?

9   A.   I've testified as an expert here in the Middle District

10  of Florida nine separate times.

11  Q.   And on what subjects have you testified?

12  A.   Maritime drug trafficking in the Eastern Pacific and the

13  Caribbean.

14  Q.   You testified on drug valuation?

15  A.   Yes, I have.

16  Q.   Based on your knowledge that you've gained through the

17  experience you just talked about, have you become familiar

18  with the typical means and methods by which drug trafficking

19  organizations in south and Central America operate?

20  A.   Yes, I have.

21  Q.   I want to turn to this case now.  What role if any did

22  you play in the investigation of this case?

23  A.   So I presented this case at Grand Jury for an

24  indictment, and then I was also present when the drugs were

25  brought in and processed those drugs.

1    Q.    Were you on scene when the vessel was interdicted by the
2    Coast Guard?
3    A.    No, I was not.
4    Q.    Are you assigned as a case agent to this case?
5    A.    I am not.
6    Q.    Aside from the limited assistance you just described, do
7    you have any duty to investigate this case?
8    A.    No, I do not.
9    Q.    Have you continued to participate in the investigation
10   of this case?
11   A.    I have not participated any further aspect of this case.
12   Q.    I would like to talk a little bit about cocaine.  What
13   is cocaine?
14   A.    Cocaine is a Schedule II drug.  It is derived from the
15   Coachella plant.  The Coachella plant is grown exclusively in
16   the and dismountain in the countries of Colombia, Bolivia and
17   Peru.  It's plant that's been there for thousands of years
18   and the locales process it.  Take the leaves and chew on it.
19   It's a stimulant and what they do for processing of cocaine
20   basically take the leaves off these plants, gather them up,
21   take all the leaves they can and move to processing place.
22   Kind of like if you see wine made they are in the barrel some
23   time around and crush the grapes in the juice here they add
24   solvents to the leaves and what it does is start extracting
25   the cocoa paste from the leaves ment that pace is typically

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   taken to another location and that location it is turned from
2   the pace in the cocaine hydrochloride which is salt.  So they
3   add more could stick chemicals and turns it from a pace into
4   the powder and pow ter formed in a kilogram which as
5   brick ment probably about this big and waste about
6   2.2 pounds.  From there those bricks because primarily
7   transported either via air or waterways they want to protect
8   it.  Salt is dissolvable in water.  It gets wrapped up in
9   numerous layers and sealed.  From there typically take ten
10  bricks and package those together.  And then they'll bundle
11  all those packages of bricks normally in a bale.  And bale
12  consists only between 20 and 40 kilograms.  And that's kind
13  of like the goldilocks size of bales when you start moving on
14  maritime.  It's big enough you can have one person move it
15  but not so heavy it takes multiple people and fairly easy to
16  transport.  From those labs it's transported either via
17  maritime conveyance from predominantly Ecuador, Colombia,
18  Venezuela depending on routes in Caribbean, central specific
19  to dental America to further addition to the United States.
20  Primarily air travel primarily Venezuela 15 fly up and bank
21  left primarily Honduras or Belize and smuggled out from
22  there.
23  Q.    I think you mentioned before you testified in court
24  before about the price of cocaine?
25  A.    That is correct.

1   Q.   How many times?

2   A.   Nine times.

3   Q.   Based on your knowledge, training, experience are you

4   able to estimate wholesale value of a quantity of cocaine in

5   the Tampa, Florida area?

6   A.   Yes, I am.

7   Q.   And what is that?

8   A.   So the range of cocaine for a kilo is about 30 to

9   34,000.  So a normally use the number 30,000 just because for

10  math it makes it lot easier.  When I say the wholesale, kind

11  of like the Costco value you're talking the bulk.  For

12  example if you're buying sodas at Costco, crate of sodas, it

13  is going to cost you $35.  If you go down to the third floor

14  lounge a want a Coke it's going to cost you about a dollar.

15  That brick of cocaine that is the large quantity Costco value

16  an individual user amount of the cocaine is approximately one

17  gram and if anybody drinks coffee or sees anyone, the sugar

18  packets, Stevia or Splenda come in one-gram packets.  The

19  cocaine coming out of the Colombia is around 90 to

20  100 percent pure.  The cocaine sold to the streets area here

21  in Tampa normally about 25 percent pure.  When he break to

22  cocaine add an adult TRANTS and increase the magnitude.

23  Q.   Speaking about let's break that down a little bit.  In

24  terms of the wholesale value, based on an interdiction

25  quantity of 970 or so kilograms of cocaine what's that

1  wholesale value?

2  A.    So if we're using $30,000 for a kilo, 900 dill Lowe's

3  times 30,000 would be 27 million.   You add in the 70 kilos.

4  07 times 30,000 is 2.1 so you're talking approximately

5  $29.1 million of wholesale value for approximately

6  970 kilograms.

7  Q.    And then I believe you testified a little bit about when

8  talking about a gram and like a sugar packet, you're

9  referring to what that would be a retail value?

10  A.    It's like a user-quantity.  Kind of like a dosage unit.

11  If taking aspirin you normally take two Tylenol, that's

12  approximately the dosage.  I guess more accurate would be

13  like if you are a having a drink of alcohol your normal if

14  you go to bar is supposed to be one ounce.  That would be

15  your normal one gram of cocaine.  Area in Tampa its $100 for

16  approximately 25 percent purity.

17  Q.    Okay.  So how many of those personal use or retail doses

18  would typically be made from one kilogram of cocaine?

19  A.    So if you took one kilogram which is thousand grams and

20  just for math because otherwise it gets complicated let's say

21  its 100 percent.  If you break it into 25 percent your

22  basically stepping on it four times.  Your 1,000 grams now

23  becomes 4,000 grams.  4,000 grams times $100 per gram is now

24  400,000 per kilogram.

25          Now, if you are talking about the bulk price of 907

1  dill grams, 900 times 400,000, comes out 360 million.  70

2  times 400 thousands 28 million.  So now you're talking three

3  # $8 million if you were breaking down that one kilogram into

4  individual dosage units at 25 percent.

5  Q.  I promise I won't make you do any more math.

6      Based on your training and experience have you

7  become familiar with how much typical fisherman makes in the

8  Ecuadorian Colombian areas?

9  A.  Yes, I am.

10 Q.  And what is that?

11 A.  They make about depending on the season how well they're

12 doing and fishing around $300 a month.

13 Q.  Are you referring to US dollars?

14 A.  US.  For example Ecuador uses US money Colombia uses

15 Colombian pesos but it's equivalent.  I don't know the exact

16 peso ratio like 288 pesos 288 million pesos to $100.  But

17 it's around $300 a month fishing.

18 Q.  I lied.  One last math question.  How much that is about

19 in a year?

20 A.  300 times 12 would be $3,600.

21 Q.  No more math I promise this time.

22      What types of vessels are used in the maritime drug

23 smuggling operations in the earn Pacific Ocean?

24 A.  So there is numerous vessels.  You have go-fast vessels.

25 Low profile go-fast vessels.  Self pro spelled

1    semi-submersible vessels.  Fishing vessels.  Sailing boats
2    and cargo vessels.
3    Q.   Do you have experience investigating cases involving all
4    of these types of vessels?
5    A.   Yes, I have.  Yes, I do.
6    Q.   Can you speak a little bit more about the low profile
7    and semi-submersible type of vessels?
8    A.   Absolutely.  So self-propelled semi-submersible or SPSS,
9    is a vessel so it doesn't not like a submarine.  Its not
10   fully submersible.  What happens there's a small little area
11   above the water.  Typically goes small speed of 2 to 3 knots
12   because it doesn't want to create a wake.  They will be
13   packed 5 to 8,000 kilos of cocaine.  Uses inch board diesel
14   engine which occupies pretty much the back half it.
15   Typically 3 to 4 people who will move that vessel and it's
16   dine signed because it can basically make an entire trip from
17   South America up into Central America without any refueling
18   and not a whole lot of navigation.
19              However, because it's end board engine it's little
20   more complicated.  So the maritime smugglers moved to
21   something called a low profile go-fast vessel which is about
22   a 30 to 40-foot vessel, it has a covered hull, bow actually
23   bows out of the water water tends to flow offer the bow.  Con
24   anything window where people sit in the back and in the back
25   you have three our four outboard engines.  Advantages

1  outboard engines there are lot more people know how to work

2  on outboard than inch board and if there's a mechanical

3  problem easier to replace that one engine than working on

4  inch board engine.

5  The vessels themselves contain lots of fuel and

6  contain normally between thousand to 2000 kilograms of

7  cocaine.

8  The advantages on it is as the boat progresses and

9  uses up fuel it actually can go faster and faster because of

10  the weight of the fuel.  Because it's larger vessel the

11  cocaine itself contained and doesn't have as much of a chance

12  to get wet, as well as -- I just lost my train of thought.

13  Its contained which it protects it.

14  They move at a rapid speed, easy to produce, SPSS

15  and PLVs are built in the jungle area and used for drug area.

16  They don't have any other legitimate uses they operate on.

17  Q.   When you say the jungle area what you referring to?

18  A.   Typically rivers estuaries within it built it there wait

19  for high tied, load it up and move it out.

20  SPSS inherently unstable kind of like if you

21  imagine a sailboat where you chop or the top and don't have a

22  sale they use the balance less of the cocaine weight to keep

23  it going.  LPP is safe, inherently stable empty or full it

24  can move equally do it bought stability issues.

25  Q.   Just to be clear on that LPV low profile vessel those

1    are typically you said built or launched from the estuaries?

2    A.   Correct.

3    Q.   What countries are these?

4    A.   Ecuador, Colombia.

5    Q.   Where does the LPV typically bring the cocaine?

6    A.   It's going to depend if it's --

7    Q.   Eastern Pacific ocean?

8    A.   Eastern Pacific.  It's going to typically go up to

9    Mexico, El Salvador, that area, upper Central America or

10   lower North America.

11   Q.   Does that also include Guatemala?

12   A.   Yes.

13   Q.   Does the -- where does the LPV end its journey does

14   land, on the ocean?

15   A.   It depends on the -- depends on the venture whose having

16   it.  Because an LPV is inherently obvious what it is.  A lot

17   of times they marry you up with another boat out of the sea.

18   Transfer cargo scuttle one boat move in.  There have been

19   reports LPV making all the way into Mexico.  It just depends

20   on which organization it is and what logistics they have set

21   up.

22         My train of thought I remember an LPV because it

23   has so much fuel requires very little logistics many like a

24   go-fast vessel needs or four refueling points to make entire

25   journey.  Lot of times they go south of gentleman lap goes

1    and up what does extend the dis-Stan of trip but makes much
2    more difficult for law enforcement to find the vessels.
3    Q.    Go-fast vessel is also referred to Panga style vessel?
4    A.    Panga open hull vessel 2 to 4 engines.  Multiple fuel
5    barrels.  Carries cocaine open on the deck because its open
6    on the deck susceptible to being seen.  Also requires much
7    more logistic because of to refuel as it moves up but
8    advantage it readily available.  Basically take any boat
9    that's out there, add extra fuel on it and away it goes.
10   Q.    I wanting to back to one of your answers a couple
11   questions ago.  You mention a scenario where the low profile
12   vessel meets another boat at sea and then I think you're
13   words were, the low profile vessel is scuttled.  What are you
14   talking about in that scenario?
15   A.    So both SPSS and LPV a lot have what's called a subtle
16   valve valve that opens up and allow sea water to fill in and
17   sink the vessel.  In that detected quickly sink the boat
18   along with the drugs and then they he is SDAP because now
19   they are floating on the surface and have to be rescued and
20   search and review survivors.
21   Q.    You reference scenario where they are spotted by law
22   enforcement and want to sink the drugs.  Do they ever
23   intentionally meet up at sea as designation with another
24   boat?
25   A.    Absolutely.

1   Q.   What do they do in that scenario?

2   A.   They are going to transfer the crew and drugs on to the

3   other boat, sink the LPV and take off until they make it to

4   land.

5   Q.   What's typical cruise size for an LPV?

6   A.   So LPV typically 3 to 4 people.

7   Q.   How about go-fast vessel?

8   A.   Go fast is going to 3 to 4 occasionally you'll see two

9   in experienced mariners.  Typically both captains and don't

10  want to split the money.  Typical composition is 3 to 4.

11  Q.   So in this scenario you just described with the ran day

12  view at sea you said the low profile vessel is scuttled and

13  sank what happens to the crew from that?

14  A.   They'll get onboard another vessel and that vessel is

15  going to have more than obviously the 2 to 4.  It's going to

16  have multiple people doing the pick up and they are going to

17  transport the drugs and those people back to the designation

18  country.

19  Q.   I'm going to show you Government Exhibit 8B, which is in

20  evidence.  You should be able to see it on the screen there.

21       Do you recognize what that is?

22  A.   I do.

23  Q.   What is it?

24  A.   That is a low profile go-fast vessel.  You can tell the

25  sealed deck design for water flow.  There is that little kind

1  tower and three outboard engines in the back.

2  Q.   Where is the cocaine typically stored?

3  A.   The cocaine is going to be stored at the front end of

4  vessel.

5  Q.   Bow?

6  A.   Bow, yes.

7  Q.   So you said for a low profile vessel you typically see 3

8  to 4 crew members?

9  A.   Correct.

10  Q.   What are their roles?

11  A.   So you're going to have the captain.  The captain is

12  overall responsible for that vessel.  They are typically the

13  ones given the coordinates where they are supposed to go ment

14  they'll have a satellite phone so they can maintain contact

15  with people who dispatched them.

16        We definitely have a mariner there to help steer

17  the vessel as well make the fuel.  They'll transfer the

18  actual to the engines to make sure there's a constant flow of

19  fuel as needed by the captain.

20        The other ones you may or may not have depending on

21  organization ment engineer is designed to be the mechanic to

22  keep the engines going in case they've mechanical problem.

23        Fourth person is the load guard.  They are

24  responsible for the cocaine itself, and they are typically

25  the country of where the designation is.  So they are there

1   to ensure that that dope when it leaves Colombia or Ecuador

2   or whatever it is gets to the final spot. A lot of times

3   they will also have a satellite phone so that way they can

4   communicate with the people they are going to facilitate the

5   ran day view or where they end up at.

6           THE COURT: When you reach a convenient stopping

7   place we'll break for afternoon.

8           MR. DEL MASTRO: Yes, your Honor. I'm sorry your

9   Honor.

10          THE COURT: When you reach a convenient stopping

11  prays we'll break for the afternoon.

12          MR. DEL MASTRO: Understood, your Honor.

13          MR. DEL MASTRO: One moment, your Honor. One last

14  question, your Honor.

15  BY MR. DEL MASTRO:

16  Q.  Why do these low profile vessels need engineers for

17  mechanics?

18  A.  Because if they run into problems people don't want

19  their drugs left out floating trying to be rescued. They

20  want the ability to continue onto their designation.

21          MR. DEL MASTRO: Your Honor, I think this is a good

22  breaking spot.

23          THE COURT: Take a 15-minute break.

24          CSO OFFICER: All rise.

25          (Jury recesses taken at 2:30 p.m.)

1    CSO:  Please be seated.

2    THE COURT:  Do you have knowledge of the recruiting

3    methods used by cartels to recruit the crew members.

4    THE WITNESS:  Yes, your Honor.

5    THE COURT:  How do you have this knowledge.

6    THE WITNESS:  Through my numerous investigations,

7    through talking with crew members, recruiters, organizers,

8    through title three intercepts from close countries listening

9    in the description of how these things are done.  Um, through

10   cooperation from my fellow law enforcement officers.  And all

11   of in Colombia, Venezuela -- not Venezuela but Ecuador.  So

12   through the last ten years of working these organizations

13   I've learned how to recruit them, how they get paid, how they

14   move the drugs through, and how the organizers do it and how

15   they know the owners.

16   THE COURT:  What interaction if any have you had

17   with the recruiters themselves.

18   THE WITNESS:  I've arrested several of them.  I've

19   done extradition through provision arrest points brought them

20   back and actually have them cooperate with me to identify

21   owners.

22   THE COURT:  Do you wish cross-examine on his

23   knowledge of recruiting methods.

24   MR. MAYBERRY:  Briefly.  Your Honor.

25   THE COURT:  All right.

1    Cross-examination

2    BY MR. MAYBERRY:

3    Q.    Good afternoon, Mr. Ray.

4    A.    Good afternoon.

5    Q.    Do you speak Spanish?

6    A.    I do not.

7    Q.    You do not?

8    A.    I do not.

9    Q.    Have you worked undercover capacity with any of the

10   cartels?

11   A.    With these cartels no.

12   Q.    Any undercover work to the Spanish speaking

13   organization?

14   A.    Yes, I have.

15   Q.    Who was that?

16   A.    When I was up in Seattle, Washington dealing it some

17   Mexicans.

18   Q.    Never in the Colombia?

19   A.    No, not Colombians.

20   Q.    Have you ever been present for the recruitment of the

21   any of these mariners?

22   A.    Say again.

23   Q.    Have you ever been present for the recruitment of the

24   any of these mariners?

25   A.    No.  None.

1    Q.    You testified that your information is partially from

2    cooperating recruiters that have been arrested, is that

3    right?

4    A.    Correct.

5    Q.    Are they cooperating -- are you familiar with

6    substantial assistance?

7    A.    Yes, I am.

8    Q.    Federal Court.  Are they cooperating because they're

9    seeking substantial assistance?

10   A.    Yes.

11   Q.    Okay.  Were you able to corroborate the identities of

12   these people that you had arrested?

13   A.    Yes.

14   Q.    Okay.  One moment, your Honor.  Mr. Ray, have you ever

15   personally observed a recruitment of a drug mariner prior to

16   their arrest?

17   A.    No.

18            MR. MAYBERRY:  I don't think I have anything

19   further, your Honor.

20            MR. DEL MASTRO:  Your Honor, may I ask a couple of

21   questions of something.

22            THE COURT:  Yes.

23            MR. DEL MASTRO:  Thank you.

24                          Redirect examination.

25   BY MR. DEL MASTRO:

Q.   Special Agent Ray have you learned about recruiting practices at all through to professional literature you have reviewed?

A.   Yes, I have.

Q.   Have you learned about it through your attending those conferences you referenced with law enforcement agencies in other countries?

A.   Yes, I have.

Q.   Thinking back to all the personal belongings and electronic devices that you've seized or have reviewed in evidence from these interdictions overall those cases you handled, did any of that ever inform your understanding and knowledge of recruitment in these drug trafficking organizations?

A.   Yes, it has.

Q.   How so?

A.   Sometimes the phone number of the recruiter is there, or even they've shown the photograph *Facebook* pose of that person saying that was the guy who recruited and validates the phone numbers and correlation of those phones.

        MR. DEL MASTRO:  One moment, your Honor.  That's you will, your Honor.

        THE COURT:  All right.  I now denied the Defendant's motion as to the issue of recruitment.  So I now denied the Defendant's motion in full.  All right.  We have

1   ten minutes left for our break.

2        MR. DEL MASTRO:  Your Honor, one question do you

3   want that similar foundation laid with the jury present?

4        THE COURT:  Well, that's up to you.

5        MR. DEL MASTRO:  Understood.

6        THE COURT:  You would probably want to lay

7   appropriate foundation for the jury but it's up to you.

8        (Recess taken at 2:36 p.m.)

9        THE COURT:  Bring in the jury, please.

10       (Jury enters at 2:50 p.m.)

11       THE COURT:  Proceed.

12       MR. DEL MASTRO:  Thank you, your Honor.

13  BY MR. DEL MASTRO:

14  Q.   Special Agent Ray, I believe we were talking about the

15  crew members on these maritime drug smuggling vessels,

16  particularly the low profile ones.  In your experience and

17  all the cases you investigated I believe you testified before

18  about inventory and receiving personal property, nondrug

19  evidence, does that include personal property items?

20  A.   It does.

21  Q.   Do the mariners on these ventures, the crew members

22  typically bring personal belongings with them on the trips?

23  A.   Yes they do.

24  Q.   What sorts of belongings?

25  A.   Clothing, cologne, pictures, cellphones, medicine,

1  condoms, they're going on a trip and they bring those items

2  they would do if they were going on a trip.

3  Q.  Did you ever see passports?

4  A.  Yes.

5  Q.  Why would they bring a passport with them?

6  A.  Because when they arrive to the country that is their

7  designation, they have to have away to get back from that

8  country to their home country.

9  Q.  Do you ever see mementos or keepsakes?

10  A.  Yes.

11  Q.  Do you know why that is?

12  A.  Well, they want to have while on their trip, pictures

13  and/or things from their family as well as some of them

14  superstitious, mariners tend to be superstitious.  Good luck

15  items that they do when going on a trip.

16  Q.  I believe you referenced earlier in your testimony

17  satellite phones.  Other electronics come in on these trips?

18  A.  GPS.

19  Q.  Why?

20  A.  Well, they need to know the route they are traveling and

21  a lot of positions preposition points along it that allows

22  the crew to know where they're going, as well as where they

23  are supposed to end up for either final designation or ran

24  day viewpoint.  As well as LPV but on go fast logistic

25  support.  They need to be able to refuel, get food, change

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  out end beginnings.  So they need to know where to be in the
2  ocean to find these spots.

3  Q.   Do you have in your training and experience of these
4  operations do you have knowledge of how crew members or
5  recruited by drug trafficking organizations?

6  A.   Yes.

7  Q.   Where is that knowledge come from?

8  A.   It comes through my investigations of these
9  organizations.  It comes through debriefing.  Mariners,
10 captains, recruiters, organizers and even owners.  In
11 addition its through my collaboration with other law
12 enforcement agents here in the United States as well as
13 overseas, as well as collaboration foreign national evidence
14 and they collected in their investigations.

15 Q.   Anything come through personal belongings or electronics
16 that you find?

17 A.   Yes, a lot of times not a lot.  Sometimes things will
18 CORROBORATE to the person was, phone calls, text message,
19 what app or any those devices or communication.

20 Q.   Who are the typical recruiters in these cases JS
21 typically people who have done these trips before and
22 successfully done several of them they can turnaround and
23 recruit other people to do this type of work?

24 Q.   How do they recruit them?

25 A.   Basically they say hey, they're known to be in the area

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  to be drug trafficking recruiters and they go after fisherman

2  who are in the need of money.  A lot of times they'll give

3  you offer if you do this trip, and depends on the length of

4  trip and the quantity of drugs what the amount is and varies

5  on the conveyance.  Go-fast vessel tends to be cheaper SPSS

6  is more expensive.  Hypothetical give you 10,000 US upfront

7  and another 10,000 on the return.  Typical whether I the

8  recruiter will take a fee of $1,000 because they found the

9  person.  And then that person will get paid the money upfront

10  when they are called they'll go out and do that venture.

11  Venture successful when they come back they'll receive that

12  money.  By having this model of success because people are

13  getting well paid most of these people are fisherman making

14  $300 a month.  When they see other people coming back flush

15  with money they feel that they want to take the risk and do

16  it because they want to make that type of money.

17  Q.    Under this model do the recruiters struggle to find crew

18  members to make trips?

19  A.    No.

20          MR. DEL MASTRO:  One moment, your Honor.

21

22  nothing further, your Honor.

23          THE COURT:  Cross?

24                      Cross-examination.

25  BY MR. MAYBERRY:

Q.   Good afternoon Mr. Ray?

A.   Good afternoon.

Q.   Do you speak Spanish?

A.   I do not.

Q.   Provided quite a bit of information on drug operations in South America.  Prior to this interdiction were you not Colombia working in undercover capacity investigating the source of these drugs?

A.   I was not.

Q.   Okay.  You were not in Colombia actively surveilling the source of these drugs?

A.   I was not.

Q.   Excuse me for one moment.  Would you agree, Mr. Ray, that you did not have any intel about any boat departing land related to this case?

A.   I did not.

Q.   Prior to this boats interdiction were you not investigating Mr. Garces Angulo in any capacity?

A.   I was not.

Q.   You are not active in this case as investigation?

A.   That is correct.

Q.   Okay.  You testified earlier I believe you said you didn't have any duty to investigate, is that right?

A.   Correct.  This case was not assigned to me.

Q.   Okay.  Did you testify in the Grand Jury on this case?

1  A.  I did.  There was previous Grand Jury that I did and I
2  helped out the other case agent because we wanted to reduce
3  the number of agents that had to testify.

4  Q.  You would agree Special Agent Ray that you don't you're
5  not familiar with this case in any firsthand capacity,
6  correct?

7  A.  That is correct.

8  Q.  All the information that you received in this case is
9  secondhand?

10  A.  That is correct.

11  Q.  Okay.  You received that information from the US
12  Attorney's Office?

13  A.  Like the operation summary, and state rep that I did for
14  Grand Jury I received from the Coast Guard.

15  Q.  So United States Attorney's Office and the Coast Guard?

16  A.  No.  I said the Coast Guard provided operational summary
17  and the situational report the one I used to testify from the
18  Grand Jury came from the Coast Guard.

19  Q.  Understood sir.  I'm sorry.  Secondhand information is
20  what you received for this case?

21  A.  That is correct.

22  Q.  Okay.  You talked today a lot about your background and
23  experience and that's what you are using to analyze this
24  case?

25  A.  That is correct.

1    Q.    Okay.  Mr. Ray, have you ever worked in undercover

2    capacity to investigate any Colombian narcotics organization?

3    A.    Not Colombians, no.

4    Q.    Have you ever been present yourself for any recruitment

5    of any mariner in Colombia?

6    A.    I have not.

7    Q.    Not any mariners to go on a drug mission?

8    A.    I have never been present another any of that.

9    Q.    Have you ever been present for any recruitment for any

10   drug trip in South America at all?

11   A.    I have not.

12   Q.    Would you agree that narcotics organizations are

13   dangerous?

14   A.    Yes, I would.

15   Q.    Would you agree they can impose their Will on anyone

16   they want?

17   A.    No, I wouldn't necessarily agree with that.

18   Q.    Okay.  Why is that?

19   A.    There are a lot of people in Colombia who are fighting

20   drug trafficking that they are not getting their Will imposed

21   upon them.  Ideal there is a whole lot of Colombian police

22   and that who bravely fight against it and they are not

23   succumbing to tar tells and drug trafficking.

24   Q.    What about si have I Lance?

25   A.    There are many people who fight against them as well.

1  Q.   Have you ever been on a drug boat that's been covertly

2  moving drugs?

3  A.   I've been on boats that covertly moving drugs not when

4  they were moving the drugs but after the fact.

5  Q.   After they came into possession of the United States

6  Government?

7  A.   Correct.

8  Q.   Okay?

9  A.   Or foreign government.

10  Q.   But you've never -- you have a never in undercover an

11  capacity been on a drug boat?

12  A.   I have not.

13  Q.   Okay.

14  Q.   The information you received how the recruiting occurs

15  you're getting that in part from cooperating witnesses?

16  A.   Yes.

17  Q.   Are those cooperating witnesses looking to get a

18  reduction perhaps in their sentence?

19  A.   Yes, they are.

20  Q.   Are they perhaps looking to avoid criminal charges being

21  imposed?

22  A.   No.  They have been arrested and they are cooperating in

23  hopes of getting reduced sentences, as well as to elaborate

24  on what they did.

25  Q.   But these are drug smugglers that have been arrested?

1   A.    Correct.

2   Q.    You talked a little bit earlier about fisherman pay.  Do

3   you have any idea what a mechanic in Colombia would make?

4   A.    I do not.

5   Q.    Do you have any idea what a mechanic shop business owner

6   would make?

7   A.    That I do not.

8           MR. MAYBERRY:  One moment to confer, your Honor?

9           THE COURT:  All right.

10          MR. MAYBERRY:  Thank you, Mr. Ray.  Your Honor,

11   nothing further.

12          THE COURT:  Any redirect?

13          MR. DEL MASTRO:  No, your Honor.

14          THE COURT:  Thank you, sir.  You may step down.

15          Witness excused.

16          THE COURT:  Call your next witness.

17          MS. OHLEY:  Your Honor, the Government rests.

18          THE COURT:  What says the defense?

19          MS. McCARTY:  Your Honor, may we approach.

20          THE COURT:  Approach the bench.

21          MS. McCARTY:  Your Honor I need to make my judgment

22   of acquittal argument I don't with you want me to make it

23   over the bench.  I just need a copy of the indictment.

24          THE COURT:  How long do you expect your argument to

25   be.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION